## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

IN RE )
 )
**ROBERT D. LARISON,** )  **Case No.  03-04394-TLM**
**JAN P. LARISON, aka Jan P.** )
**Robinson,** )
 )
 Debtors. )
_____ )
 )
 )
**RICHARD E. CRAWFORTH,** )
**Chapter 7 Trustee,** )
 )
 Plaintiff, )
 )
 vs. )  **Adversary No. 05-6001-TLM**
 )
**H & H ENTERPRISES, L.L.C.,** )
**an Idaho limited liability company,** )  **MEMORANDUM OF**
 )  **DECISION**
 )
 Defendant, )
 )
_____ )

## I.  INTRODUCTION

This is a preference case.  Richard Crawforth ("Plaintiff") is the chapter 7

trustee for the estate of chapter 7 debtors Robert and Jan Larison ("Debtors").

Plaintiff filed this adversary proceeding to avoid under § 547(b) the transfer of two

checks totaling $21,850.77 to H & H Enterprises, L.L.C. ("Defendant").  The

MEMORANDUM OF DECISION - 1

matter was tried to the Court on July 14, 2005 and taken under advisement subject to post-trial briefing which has now been filed.  This Decision constitutes the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052.[1]  The Court determines that judgment shall be entered for Plaintiff.

## II.  FACTS

The following facts are established by the preponderance of the evidence presented to the Court at trial.

### A.  Creation of the debt

On August 7, 2000, Defendant loaned Debtors $35,000.00.  The loan was evidenced by a promissory note, and it was secured by a second position deed of trust on Debtors' residence and surrounding property.  *See* Ex. 1, Ex. 2.[2]  The deed of trust was recorded that same date in the real property records of Twin Falls County, Idaho.

Mrs. Larison (*nee* Robinson) testified about how this loan arose.  She and Mr. Larison wanted a "debt consolidation loan" and approached a loan broker

---

[1] Some preliminary matters.  The Court has jurisdiction under 28 U.S.C. § 1334(b), and this is a core proceeding, 28 U.S.C. § 157(b)(1), (b)(2)(F).  Venue is proper.  28 U.S.C. § 1409.  All factual findings based upon testimony reflect and incorporate the Court's evaluation of the witnesses and the weight ascribed to their testimony, even where the findings make no reference to such issues.

[2] The note was signed on August 2, 2000, but bore a printed date of August 7, 2000.  The note refers to Robert Larison and Jan Robinson as a single man and a single woman.  The deed of trust referred to them as an unmarried man and an unmarried woman.  There was no dispute however that these two individuals were the Debtors and that they jointly had an interest in the property, obtained the loan, signed the note, and pledged the real estate as security.

MEMORANDUM OF DECISION - 2

who, in turn, put them in contact with Defendant.[3]  The loan documents were prepared by Defendant, with the exception of escrow instructions for a long term escrow created to handle the payments Debtors would make to Defendant.  *See* Ex. 4.

### B.  Release of security

About a year later, Debtors requested that Defendant release the security of the deed of trust, Ex. 2, in order for them to refinance the first position secured obligation on the Twin Falls property.  Defendant agreed and, on March 9, 2001, executed a request for reconveyance of its deed of trust.  *See* Ex. 6.[4]  On March 14, 2001, First American Title Company, Inc. ("FATCO"), as trustee under the deed of trust, executed a deed of reconveyance and recorded it in the Twin Falls County real property records.  Ex. 7.  The note obligation to Defendant was thereafter unsecured.[5]

### C.  Payments on the debt

---

[3]  The broker received a $500.00 fee, and Debtors received $34,500.00 of the total loan amount.  *See* Ex. 5.

[4]  This request expressly notes that "[t]he Promissory Note at this time is not paid off, but the Beneficiary [Defendant] requests said Deed of Trust to be reconveyed on the subject property described in the Deed of Trust."  *Id.*

[5]  Defendant argues that the deed of trust was to be released and the loan left unsecured only for a short period of time, and that this deed of trust was again to be recorded ("re-recorded") after the refinancing of the first position indebtedness was accomplished.  Mrs. Larison essentially agreed with this version, but she noted that the refinancing was never accomplished.  The promise to re-record, or its alleged breach, was not shown by Defendant to be relevant to Plaintiff's cause of action under § 547(b).

MEMORANDUM OF DECISION - 3

After the release of the security in March, 2001, Debtors continued to make payments for Defendant's benefit at FATCO, which had a long term escrow account (#1068) open to service the note. *See* Ex. 10 (ledger, showing payments).[6] This escrow was established at the time the loan was made in August, 2000. *See* Ex. 4.[7]

In November, 2002, Debtors sold their residence in Twin Falls County. If there were any net proceeds of sale (after payment of closing costs and of the "first" – and after March, 2001 apparently only – secured debt), none were used to pay Defendant's now unsecured note obligation. *See* Ex. 10 (itemizing 2002 payments).

After Defendant became aware of this sale, one of its members, Ranee Haight, discussed the situation with Mrs. Larison. The discussions led to a promise by Debtors that they would continue paying on the note and they would satisfy the balance from the proceeds of sale of two other parcels of property they

---

[6] The August 2, 2000, escrow agreement and instructions reflects that "First American Administrative Services, Inc." or "FAAS" was the holder of Debtors' and Defendant's escrow. *See* Ex. 4; Ex. A (same). Most of the references, in the documents and certainly by witnesses at trial, were simply to FATCO. *See*, *e.g.*, Ex. B (escrow and closing instructions, also dated August 2, 2000, addressed to First American Title and Escrow). The Court concludes that FAAS has some affiliation or relationship with FATCO. It also notes that the parties have raised no legal issue dependent on a distinction between FAAS and FATCO. Apparently both Plaintiff and Defendant are content to refer generally to FATCO in these regards.

[7] Mrs. Larison was employed with FATCO at the time the loan was made in 2000. At some point, Mrs. Larison became involved in handling, and not just marketing, FATCO's long term escrows. She acknowledged doing calculations on some of the payments made to long term escrow account #1068 and admitted she had access to the file. Though certainly unusual, this situation was not shown by Defendant to have any relevance to the § 547(b) issues before this Court.

MEMORANDUM OF DECISION - 4

owned in the Treasure Valley.[8]  One of the parcels was bare ground owned by Mrs.

Larison.  The other was a residential property at 161 W. Spicewood in Meridian,

Idaho, used by Debtors as a rental property.

### D.  Sale of Treasure Valley properties and disposition of proceeds

In September, 2003, the two real property parcels were sold.  A portion of

the proceeds of sale on each parcel was transmitted to FATCO in payment of

Debtors' indebtedness to Defendant.

### 1.  The September 5 transaction

In early 2003, Mrs. Larison was facing the possible loss of the bare parcel

due to financial problems.  Her brother, Richard Pickett, "bailed her out" of her

difficulties and, in return, she gave him and his wife, Rhonda, a quitclaim deed to

the property.  Mr. Pickett owed Mrs. Larison about $8,000.00.  They verbally

agreed that when the Picketts sold the parcel, they would pay Mrs. Larison

$8,000.00 from the proceeds.

On September 5, 2003, the Picketts sold the property to Brett and Karen

Ballantyne.  Pioneer Title Company ("Pioneer") acted as the closing agent on the

sale.[9]  The Picketts instructed Pioneer to pay, to FATCO, $8,000.00 of the funds

otherwise due to them as sellers.  *See* Ex. I (seller's closing statement, reflecting

---

[8]  Debtors did not grant Defendant a security interest in either of those properties.
Testimony was somewhat unclear as to whether a security interest was ever sought but, in any
event, there was no deed of trust in favor of Defendant on either parcel.

[9]  Because the Pickett-Ballantyne sale included some seller-carried financing, Pioneer
also was the escrow agent on a long term escrow.

MEMORANDUM OF DECISION - 5

Picketts' instruction to "Pay Demand of: to First American Title . . . $8,000.00");
*see also* Ex. H (escrow instructions, incorporating by reference the parties' closing
statements). Mike Goddard, a vice president and manager of Pioneer's Caldwell,
Idaho office, indicated that the instructions to make this distribution of money,
which otherwise would be payable to the Picketts, came from Mr. Pickett and was
verbal rather than written.

Pioneer did as it was instructed, sending the $8,000.00 check to FATCO
and referencing in that transmittal FATCO's long term escrow account #1068. *See*
Ex. 8. That September 5 check was in fact received by FATCO, and applied to the
long term escrow account on September 11, 2003. *See* Ex. 10 (reflecting
application on September 11). Mrs. Haight, one of the two members of Defendant,
acknowledged that FATCO received the check and paid the proceeds to
Defendant.

### 2.   The September 12 transaction

The other property, on West Spicewood in Meridian, was owned by
Debtors. They were renting it out, and ultimately decided to sell it to the renter.
On September 12, 2003, a transaction closed under which Debtors sold the
property to Jeffery Crose. TitleOne Corporation ("TitleOne") was the closing
agent on this sale. *See* Ex. G. (escrow closing instructions).

The sale date was September 12. A settlement statement of this date
reflects a gross sales price of $112,000.00. *See* Ex. E. In addition to the sellers'

MEMORANDUM OF DECISION - 6

[Debtors'] share of taxes and payment of mortgage debt, certain "settlement charges to seller" causing "reductions in amount due to seller" were shown. They totaled $21,496.45. *Id.* at 1, line 502. They were itemized later in the settlement statement and included "Payoff long term to First American Title [. . .] Long term # 1068" in the amount of $13,850.77. *Id.* at 2, line 1305. Not only was this settlement statement signed by Debtors, *id.* at 3, they specifically authorized the disbursement of proceeds in this fashion. *See* Ex. F at 2 ("disbursement of proceeds" form signed by Debtors instructing TitleOne to "Send proceeds for 2nd Mtg [mortgage] payoff Twin Falls long term 1068").

TitleOne did as instructed, and sent its September 12 check in the amount of $13,850.77 to FATCO. *See* Ex. F; *see also* Ex. E, Ex. G. That check was received by FATCO and applied on September 22 to Debtors' note obligation to Defendant in FATCO's long term escrow account # 1068. *See* Ex. 10.

The balance of Debtors' unsecured obligation to Defendant, after receipt of the two payments, was $18,192.62. *See* Ex. 10. No further payments were made by Debtors on this obligation.

### E.  Bankruptcy

Debtors filed their petition for relief on December 4, 2003. Trustee has assets on hand of roughly $3,500.00 representing Debtors' tax refunds. He anticipates no other assets will be administered except what might be recovered through the instant litigation. There are unsecured claims filed in the case

MEMORANDUM OF DECISION - 7

exceeding $5,200.00.[10]  Even without considering the impact of Trustee's fees and

compensation for his professionals, there will not be full distribution in this

chapter 7 case.[11]

## III.  DISCUSSION AND DISPOSITION

### A.  Burdens and elements in preference avoidance action

In order to avoid a transfer as a preference under the Code,
the trustee must prove by a preponderance of the evidence that
a transfer of property of the debtor occurred and that such transfer (1)
was made to or for the benefit of the creditor; (2) for or on account
of an antecedent debt; (3) while the debtor was insolvent, (4) within
90 days before the date of filing of the petition; and (5) enabled the
creditor to receive more than it would have received in a chapter 7
liquidation if the transfer had not been made.

*Elsaesser v. Cent. Pre-Mix Concrete Co. (In re Pioneer Constr., Inc.)*, 01.2

I.B.C.R. 66, 67 (Bankr. D. Idaho 2001) (citing *Arrow Elecs., Inc. v. Justus (In re*

*Kaypro)*, 218 F.3d 1070, 1073 (9th Cir. 2000); and *Hymas v. Am. Gen. Fin., Inc.*

*(In re Chase)*, 00.2 I.B.C.R. 73, 76 (Bankr. D. Idaho 2000)); *see also Hopkins v.*

*Nord (In re Kent)*, 04.3 I.B.C.R. 113, 114 (Bankr. D. Idaho 2004); *Crawforth v.*

---

[10]  At trial, Plaintiff discussed claims of approximately $4,200.00.  Since that time, the
clerk has docketed two more claims, bringing the total amount of claims filed to $5,226.42.

[11]  Defendant correctly notes that a party found liable for and satisfying a judgment
avoiding a preferential transfer has the ability to file a claim in the amount of such satisfaction.
*See* § 502(d), (h).  After paying the judgment that will be entered herein, were Defendant to file a
proof of claim under these provisions, it will share pro rata with other unsecured creditors with
timely filed claims.  (In fact, given the amount of other unsecured claims that were timely filed,
Defendant would receive the majority of distributions made to this class of creditors at the time
the estate is closed.)  However, the possibility of a § 502(h) claim does not vary the result of the
§ 547(b)(5) analysis, as Trustee's testimony and the balance of the record establish that the estate
will not be able to fully pay such claims.

MEMORANDUM OF DECISION - 8

*Treasure Valley Fed. Credit Union (In re Tuttle)*, 03.3 I.B.C.R. 192, 193 (Bankr. D. Idaho 2003).

Thus, Plaintiff has the burden of proving, by a preponderance of the evidence, the several elements required to avoid a transfer under § 547(b). *Pioneer Constr.*, 01.2 I.B.C.R. at 67.  If he meets that burden, Defendant has the burden of proving, as affirmative defenses, one or more of the exceptions under § 547(c).  *Id.* (citing *Elsaesser v. Am. Express Travel Related Servs. Co., Inc. (In re Taylor)*, 95 I.B.C.R. 216, 218 (Bankr. D. Idaho 1995); and § 547(g)).[12]

It did not appear that all § 547(b) elements were going to be at issue in this case.[13]  Defendant, however, was rather ambiguous in conceding this point or in identifying which of the elements of § 547(b) would be contested.  Thus Plaintiff proceeded to establish each of the elements of the cause.

### B.  Conclusions regarding Plaintiff's proof of the elements

---

[12]  Defendant's answer, Doc. No. 7, alleged no § 547(c) defense, and no evidence was presented at trial to support any statutory defense under § 547(c).

[13]  In its pretrial brief, Doc. No. 19, Defendant disputed whether the evidence could establish that there was a transfer of "an interest of the debtor in property."  Other elements of § 547(b) received no discussion.  It was not at all clear that Defendant disputed any of the elements of § 547(b)(1) through (b)(5) with the possible exception of "antecedent debt."  *See* Doc. No. 7 (answer) at 2-3.

Further, in this brief filed only days before trial, Defendant argued that *if* Debtors had an interest in the property transferred, it was traceable to their exempt homestead property.  (The brief did not clarify which parcel was Debtor's homestead, though it obviously could not have been both).  Defendant argued that transfers of exempt property could not be avoided as preferences, relying on case authority prior to enactment of the Bankruptcy Code in 1978.  This argument appeared contrary to *Fox v. Smoker (In re Noblit)*, 72 F.3d 757 (9th Cir. 1995), a case Defendant acknowledged but did not persuasively distinguish.  In any event, Defendant admitted at the commencement of the trial that the theory lacked evidentiary support because neither parcel was Debtors' homestead, and thus abandoned the argument.

MEMORANDUM OF DECISION - 9

The Court finds and concludes that Plaintiff proved, certainly by a preponderance of the evidence and in many cases without any evidence at all to the contrary, the following.

**(1).   The subject transfers were made "to or for the benefit of a creditor."  Section 547(b)(1).**

Defendant was a creditor of Debtors based upon the August 7, 2000 promissory note, Ex. 1.  Defendant was still a creditor of Debtors at the time of the bankruptcy filing.  *See* Ex. 10.  The indebtedness owed Defendant was unsecured, given the release of security in March, 2001.  Ex. 7.  The transfers, though not received directly by Defendant, were received by FATCO for Defendant's benefit and immediately applied to the debt Debtors owed Defendant.  Ex. 10.

**(2).   The transfers were "for or on account of an antecedent debt owed by the debtor before such transfer was made." Section 547(b)(2).**

The transfers occurred in September, 2003.  The debt arose in August 2000, when Debtors became legally obligated to pay.  *Kent*, 04.3 I.B.C.R. at 114.  The debt is antecedent because it arose before the transfer in question.  *Id.*; *see also Chase*, 00.2 I.B.C.R. at 77.  The payments were made to reduce this debt, consistent with the representations made by Mrs. Larison to Mrs. Haight that the real property proceeds would be so applied.  The payments were "for or on account of" the antecedent debt.

**(3).   The transfers "were made while the debtor was insolvent." Section 547(b)(3).**

MEMORANDUM OF DECISION - 10

Debtors are presumed to be insolvent throughout the 90 day period immediately preceding the December 4, 2003, filing of their petition for relief. *See* § 547(f). That presumption encompasses the dates of the subject transfers. Mrs. Larison's testimony concerning Debtors' assets and liabilities in September, 2003, corroborated the presumption. Defendant offered no evidence to the contrary and did not rebut this presumption.

### (4). The transfers were "made on or within 90 days before the date of the filing of the petition." Section 547(b)(4)

The 90th day before the December 4, 2003 petition was September 5, 2003. Section 547(e) specifies the time a transfer is deemed to have occurred for purposes of analyzing the existence of a preference. *Fitzgerald v. First Sec. Bank (In re Walker)*, 77 F.3d 322, 323 (9th Cir. 1996). Here, the transfer was a transfer of funds by check. A transfer of an interest in personal property is "perfected" for preference purposes "when a creditor on a simple contract cannot acquire a judicial lien [in the property transferred] that is superior to the interest of the transferee." § 547(e)(1)(B); *Long v. Joe Romania Chevrolet, Inc. (In re Loken)*, 175 B.R. 56, 60 (9th Cir. BAP 1994); *Fitzgerald v. First Security Bank (In re Walker)*, 161 B.R. 484, 488, 93 I.B.C.R. 273 (Bankr. D. Idaho 1993). When a check is the instrument of transfer, the transfer is deemed to have occurred when the check is honored by the drawer's payor bank. *MBNA Am. v. Locke (In re Greene)*, 223 F.3d 1064, 1067 (9th Cir. 2000) (citing *Barnhill v. Johnson*, 503 U.S. 393, 395 (1992)).

MEMORANDUM OF DECISION - 11

The checks at issue here were dated September 5 and 12, 2003. FATCO applied the payments on Defendant's account on September 11 and 22, 2003. The honor necessarily occurred during the intervening days. All these days were within the 90 day preference period preceding the December 4, 2003 petition date.[14]

### (5). The transfers enabled Defendant to receive more than it would have under chapter 7 in the absence of the transfers. Section 547(a)(5)

*Chase* notes that the Court must compare the amount of the subject transfer with the amount the creditor would receive in a hypothetical chapter 7 liquidation had the transfer not occurred. 00.2 I.B.C.R. at 77 (citing *Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1423 (9th Cir. 1985)).

A respected treatise summarizes the holding of *Elliott* in the following fashion:

> In determining the amount that an alleged preferential transfer enables the creditor to receive, the creditor must be charged . . . [with] the value of what was transferred plus any additional amount that he would be entitled to receive from a chapter 7 liquidation; [the] net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.

---

[14] This is not a situation where the date of issuing a check and the date of that check's honor straddle the preference breakpoint. It is in those situations that the question of when the transfer by check occurred becomes significant. *See Barnhill*, 503 U.S. at 394-95. The Court further notes at this juncture that Defendant's arguments regarding the escrows and property of the debtor relate in part to when, as well as if, the transfers occurred. Those points are addressed later in this Decision.

MEMORANDUM OF DECISION - 12

5 Collier on Bankruptcy ¶ 547.03[7] at 547-45 (Alan N. Resnick & Henry J.

Sommer, eds. rev. 15th ed. 2002).

The distribution in this case will be less than 100 percent. Trustee's

testimony meets the burden of establishing this element.[15]

### C.  Defendant's arguments regarding "transfer of property of the debtor"

The gravamen of Defendant's opposition to Plaintiff's preference complaint

is that the funds transferred were not "property of the debtor" but, rather, property

of the purchasers of the two parcels (Ballantyne and Crose), disbursed or

distributed by the two title companies (Pioneer and TitleOne).  *See*, *e.g.*, Doc. No.

19 at 4 (contending that the transfers were not "made" by Debtors but, rather, by

the title companies), and at 5 (the title companies "made transfers not of the

debtor, but of the purchaser of the properties); *see also* Doc. No. 25 at 2-3.

Defendant relies upon *Burch v. Bonded Adjusters, Inc. (In re Pelc)*, 34 B.R.

823 (Bankr. D. Or. 1983).[16]  However, Defendant glosses over important

differences in the situation there addressed, which distinguish the case from that

now before this Court.

---

[15] Defendant criticizes Plaintiff's projected distribution analysis.  *See* Doc. No. 25 at 4.
While such criticism may be well taken, there was no evidence rebutting Plaintiff's testimony and
conclusion that distributions on unsecured creditor claims would be less than 100 percent.  Thus,
the § 547(b)(5) element is satisfied.

[16] This decision is obviously not binding on the Court.  However, decisions of other
bankruptcy courts cited by litigants or unearthed by the Court's research are regularly reviewed
and evaluated for their persuasiveness.

MEMORANDUM OF DECISION - 13

In *Pelc*, the debtors (the "Pelcs") sold their home in June 1980 to parties named Dahl. At that time, there were a number of outstanding judgments against the Pelcs which were liens or potential liens against the property. Many of these creditors were paid out of the "down payment" in June 1980. Others remained. The balance of the sales price was to be paid by the Dahls in installments in June of 1981 and 1982. The sale was closed into escrow, and the Dahls were to make payments to the escrow holder, a title company. 34 B.R. at 824.

In June, 1981, it appears that an installment payment was made by the buyers, the Dahls, to the escrow holder, who in turn disbursed it on June 17, 1981, to several of the Pelcs' creditors as required under the June 1980 escrow instructions. Two days later, the Pelcs filed their petition for relief. The payments to the Pelcs' creditors in June 1981 were claimed by the Pelcs' trustee to be preferences. *Id.*

The court concluded that the delivery by the Pelcs of the Dahl note, mortgage and an executed satisfaction of mortgage into the escrow and subject to the escrow instructions constituted a "transfer" within the meaning of the Bankruptcy Code. 34 B.R. at 826. Furthermore:

> *Property of the debtors, the right to receive payment from the Dahls,* was transferred at the time of delivery into escrow of the note, mortgage and Satisfaction of Mortgage. The interest of the debtors after delivery was wholly dependent on the terms of the escrow. Consequently, distribution of the [Dahls'] installment to the [Pelcs'] judgment creditors pursuant to the escrow instructions did not involve a transfer of property of the debtors. Absent consent on the

MEMORANDUM OF DECISION - 14

> part of the Dahls the escrow instructions could not be modified and
> the Pelcs had a property right only to the extent so provided in the
> escrow instructions.

*Id.* at 826-27 (emphasis added).

Stated in other terms, the court found that the Pelcs had transferred, at the time of creation of the escrow in June 1980, their prospective right to funds they would receive from the Dahls in the 1981 and 1982 installments. The Pelcs' right to those funds, or their right to direct the use or application of those funds, was transferred irrevocably *via* the escrow instructions, unless the Dahls were to consent otherwise.[17]

The situation here is, simply put, different.

The August, 2000 transaction between Debtors and Defendant regarding the Twin Falls property certainly contained no similar "transfer" or commitment of funds that Debtors might receive or become entitled to in the future. While Debtors and Defendant did use an escrow (the FATCO escrow), nothing in their escrow agreement constituted a transfer of Debtors' property or interests in property to Defendant in August 2000 (other than, of course, the granting of the deed of trust). In August, 2000, Debtors simply made an agreement to repay Defendant for the loan.

---

[17] The court noted that the intended payment of the Pelcs' judgment creditors through the escrow and from the Dahls' installment payments was an integral part of the transaction, satisfying not only the Pelcs' obligations to those creditors but protecting the Dahls by eliminating clouds on title. *Id.* at 826. That the Dahls would consent to modification and allow the payments to be otherwise accessed by the Pelcs and used for different purposes appears remote.

MEMORANDUM OF DECISION - 15

The more arguable application of *Pelc* relates to the later sale of the Treasure Valley properties, each of which also closed into escrow, and the disbursements made from those sales to Defendant which are now alleged to be avoidable transfers. Even here, Defendant's argument does not withstand scrutiny.

### 1. The September 12 transaction

When Debtors sold the Meridian rental property on September 12, 2003 to Crose, they for the first time became entitled to receive the proceeds of that sale. Before that date, their "interest in property" was an interest in the real property.

Upon selling the Meridian property to Crose, Debtors simultaneously directed TitleOne to remit $13,850.77 of the sales proceeds they would otherwise receive to FATCO for application on their obligation to Defendant in long term escrow # 1068. *See* Ex. F. Despite the use of an escrow, it was only on September 12 that Debtors effected a transfer of their interests in property, *i.e.*, the proceeds of sale, to FATCO for the benefit of Defendant.[18]

---

[18] For *Pelc* to be analogous, some significant changes in the operative facts would be required. Assume, for example, that Debtors were in the process of selling the Meridian property in late 2002 or early 2003, when the discussions between Mrs. Larison and Mrs. Haight took place. Assume further that, at that time, Debtors consummated a sale to Crose and closed it into escrow. Assume, also, that Crose did not fund the purchase in full but, rather, a part of his payments to Debtors would come due and be paid into escrow within what later turned out to be the preference period (September 5, 2003 to December 4, 2003). Finally, assume that the escrow instructions between Debtors and Crose committed in an essentially unmodifiable fashion the application of Crose's fall 2003 payments to the satisfaction of Defendant's claim. What *Pelc* would suggest is that the transfer of Debtors' rights for § 547 purposes occurred at the time the escrow with Crose was created, and not in the preference period when Crose made payments to the escrow which in turn were disbursed to Defendant.

MEMORANDUM OF DECISION - 16

The theory addressed in *Pelc* operates to move the effective date of the transfer of property of the debtor from the date of disbursement of funds by the escrow holder to the earlier date (and one potentially outside the 90 day preference period) when the debtors irrevocably commit to a specific application of funds to be received in the future. But even if a *Pelc* construction should be applied in connection with the Debtors' transaction with Crose, the date of the creation of the Debtors-Crose escrow was itself within the preference period.

Debtors clearly had rights in the funds to be received from Crose through TitleOne. The funds represented the proceeds of the sale of their real property. That Debtors contractually agreed with this title company that a portion of the funds to be paid to them could instead be paid to the FATCO escrow account for the benefit of Defendant, rather than to themselves personally, is of no consequence to the concept that Debtors obtained and had rights in and to those funds. Debtors simply directed TitleOne, as their closing agent, to disburse their funds in a particular fashion. It was thus a transfer "of an interest of the debtor in property" under and within § 547(b).

### 2. The September 5 transaction

Defendant also argues that the transfer in the September 5 transaction was not of "property of the debtor" noting that Debtors were not involved at all in the Pickett-Ballantyne sale. Defendant apparently views the $8,000.00 payment as a transfer of property of Pickett or Ballantyne. Of course, neither Pickett nor

MEMORANDUM OF DECISION - 17

Ballantyne had a debt to Defendant and neither gratuitously paid Defendant. The payment was made only because Debtors directed it, and because Pickett owed Debtors money. Defendant's argument thus ignores the reality of the situation.

The Ninth Circuit has recognized that "what 'constitutes a transfer [for bankruptcy purposes] and when it is complete' is a matter of federal law." *Walker*, 77 F.3d at 323 (quoting *Barnhill,* 503 at 397 (additional citation omitted)); *Chase*, 00.2 I.B.C.R. at 76. The federal definition of a transfer is broad. *See* § 101(54) (defining transfer as every mode, direct or indirect, absolute or conditional, of disposing of or parting with an interest in property); *see also Chase*, 00.2 I.B.C.R. at 76. If Debtors had rights to or interest in $8,000.00 from the Pickett-Ballantyne closing, that the mode of transfer was a direction, honored by Pioneer, to pay Debtors' obligation in FATCO's long term escrow account # 1068 rather than Debtors directly, appears to make no difference.

Defendant points out, correctly, that "a transfer is not made until the debtor has acquired rights in the property transferred." Section 547(e)(3). Defendant discounts the idea that Debtors had acquired any rights in the property (*i.e.*, the funds) transferred, because they were funds deposited into escrow by Ballantyne (the buyer) and were funds in the possession of and transmitted by Pioneer.

However, Debtors obtained rights in the $8,000.00 when Mr. Pickett instructed Pioneer to pay it to Debtors' benefit. Up to that point, Debtors did not hold an  interest in any identifiable property or funds; instead, Debtors had Mr.

MEMORANDUM OF DECISION - 18

Pickett's promise to repay a debt to them, much like an account receivable. Mr.

Pickett, with Debtors' knowledge, concurrence and direction, paid the funds not to

Debtors directly but, rather, at their request to their account obligation at FATCO

for the benefit of Defendant. While Debtors did not have physical possession of

these funds at the time of their transfer to FATCO for Defendant's benefit,

possession is not the sole type of ownership interest that will create rights in the

property.[19]

Debtors did what Mrs. Larison promised Mrs. Haight they would do: take

the net proceeds of the sales of their Treasure Valley property interests and apply

the same to their debt to Defendant. And, even though Debtors had lost the bare

ground parcel, they ensured that when Mrs. Larison's brother sold it, he would

satisfy the obligation he owed to Debtors through payment, and further ensured

---

[19] Courts have recognized that to constitute a preference, the transfer need not be made
directly by the debtor and that the circuity of the arrangement will not keep the trustee from
avoiding it. The Supreme Court has stated:

> The 'accounts receivable' of the debtor, that is, *the amount owing to him on open
> account*, are, of course, as susceptible of preferential disposition as other property;
> and if an insolvent debtor arranges to pay a favored creditor through the disposition
> of such an account, to the depletion of his estate, it must be regarded as equally a
> preference, whether he procures the payment to be made on his behalf by the debtor
> in the account, – the same to constitute a payment in whole or part of the latter's
> debt, – or he collects the amount and pays it over to his creditor directly. This
> implies that, in the former case, the debtor in the account, for the purpose of the
> preferential payment, is acting as the representative of the insolvent, and is simply
> complying with the directions of the latter in paying the money to his creditor.

*Nat'l Bank of Newport v. Nat'l Herkimer County Bank*, 225 U.S. 178, 184 (1912) (emphasis
added); *see also Boston Reg'l Med. Ctr., Inc. v. Seventh Day Adventist Hosp. Ret. Fund (In re
Boston Reg'l Med. Ctr., Inc.)*, 292 B.R. 718, 722-23 (Bankr. D. Mass. 2003) (recognizing that
*Nat'l Bank of Newport*'s analysis of transfers and preferences "continues to control under the
present Bankruptcy Code").

MEMORANDUM OF DECISION - 19

that such payment would go not to Debtors but directly to their escrow account

obligation to Defendant.

Therefore, the Court concludes that Plaintiff has sufficiently established that

"a transfer of an interest of the debtor in property" occurred.

### D.  Liability

To the extent a transfer is avoided under § 547, "the trustee may recover,

for the benefit of the estate, the property transferred, or, if the court so orders, the

value of such property, from . . . the initial transferee of such transfer or the entity

for whose benefit such transfer was made[.]" Section 550(a)(1).  It is clear that

Defendant is the entity for whose benefit the transfers were made.  Plaintiff makes

no argument that it should recover against FATCO as the initial transferee.

Additionally, decisions have recognized that an "equitable conduit" defense exists

for certain intermediaries.  In *Post-Confirmation Comm. of Unsecured Creditors of*

*Incomnet Communication Corp. v. Universal Serv. Admin. Co. (In re Incomnet,*

*Inc.)*, 299 B.R. 574, 578-80 (9th Cir. BAP 2003), the Panel explained that the

conduit defense to liability under § 550 is applicable to two-step transactions:

"[w]hen A gives a check to B as an agent for C."  Under such circumstances, the

intermediary (B) is a mere conduit that delivers property from the transferor (A) to

the initial transferee (C).  In such situations, the intermediary (often a financial

institution) is not responsible for returning the transfer.

MEMORANDUM OF DECISION - 20

Defendant was here the initial transferee. FATCO was but a conduit. The liability for the value of the transfer under § 550(a)(1) rests on Defendant.

## VI.  CONCLUSION

The preference provisions of federal bankruptcy law are complex and not widely understood outside the more experienced members of the bankruptcy bar. That a transfer may be avoided and unwound, and a creditor obligated to disgorge prebankruptcy payments it received to the trustee of the debtor's estate, can be a difficult thing to explain to a preference defendant. But while Congress has recently modified the preference provisions of the Bankruptcy Code,[20] the basic structure that has been applied over the past 26 years remains. Trustees will continue to sue for, and collect, preferential and other avoidable transfers. Difficulty in understanding how, or why, the Code operates is no defense to its operation.

The Court concludes that Plaintiff has established, by a preponderance of the evidence, all the elements necessary under § 547(b) for avoidance of the transfers of the two subject checks as preferences. Defendant has established no § 547(c) or other defenses. Judgment will be entered for Plaintiff in the amount of $ 21,850.77. Plaintiff shall provide an appropriate form of judgment.

---

[20] *See* The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). With certain exceptions, most of the provisions of BAPCPA become effective October 17, 2005. None of the presently effective amendments impact the outcome of the instant litigation.

MEMORANDUM OF DECISION - 21

DATED:  July 28, 2005



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 22